**SO ORDERED.**

**SIGNED this 24th day of November, 2014.**



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

_____

For on-line use but not for print publication
# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **IRMA EILEEN KIDD,** | **CASE NO. 11-12357** |
| **DEBTOR.** | **CHAPTER 7** |
| **PATRICIA A. GEPNER,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 11-5291** |
| **IRMA EILEEN KIDD,** | |
| **DEFENDANT.** | |

## MEMORANDUM OPINION AND ORDER

On July 28, 2005, Debtor Irma Kidd signed a loan agreement in which Debtor's

husband, Terry Kidd, promised to pay Patricia A. Gepner (Plaintiff) $34,647.89, plus

interest. That agreement further provided that "[i]n the event of my [Terry's] death prior

to completion of payment of this debt in full, the balance of the debt still outstanding will be assumed by Irma Kidd." Terry died before the debt was paid in full. The first question before the Court is whether, outside the bankruptcy arena, Debtor was legally obligated to pay Plaintiff the unpaid balance. If the answer to that question is yes, the next question is whether Debtor engaged in conduct covered by either § 727(a)(2)(A) or (a)(4)(A) so that her discharge should be denied.

While Plaintiff's claim against Debtor was pending in state court, Debtor filed a petition for relief under Chapter 7. Plaintiff filed a proof of claim for $49,772.75, to which Debtor objected.[1] Plaintiff also filed this adversary proceeding objecting to the discharge of Debtor under 11 U.S.C. § 727(a)(2) and (a)(4). Debtor's objection to Plaintiff's claim was consolidated with the adversary proceeding for purposes of trial, which was held on May 6 and 7, 2014.[2] Plaintiff appeared by Edward J. Nazar of Redmond & Nazar, L.L.P. Debtor appeared by Ryan Hodge of Ray Hodge & Associates, L.L.C. For the reasons stated below, the Court overrules Debtor's objection to Plaintiff's proof of claim and denies Plaintiff's objections to Debtor's discharge.

---

[1] Doc. 45.

[2] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order No. 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2014). Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (J). In the pretrial order, the parties stipulated to the jurisdiction of the Court and consented to the entry of a final order by this Court. There is no objection to venue or jurisdiction over the parties.

**FINDINGS OF FACT.**

Witnesses at the trial were Plaintiff, Patricia Gepner (Pat); Vicki Larison (Vicki), Pat's daughter, who assisted her with her finances; Debtor Irma Kidd (Irma or Debtor); David Kidd (David), Irma's son, who assisted her with her financial affairs; Jennifer Kidd (Jennifer), David's wife; and Dana Milby, Debtor's bankruptcy counsel. Although the witnesses did not present consistent testimony about the events in issue, the Court finds that each witness testified truthfully about his or her current recollection of events that happened over ten years ago. Fortunately, resolution of the issues in the case does not require the Court to accept one witness's version over that of another witness, because the inconsistencies related primarily to background dates and events. As to these matters, the Court adopts the version which forms the most credible and likely scenario consistent with the documentary evidence.

Commencing some time in the 1990's, Terry Kidd, Debtor's husband, was the operator of a retail store in downtown Augusta, Kansas, known as Kidd's Early Bird Gifts. Pat believed that the store was a family business owned by Terry, Debtor, and their children. Debtor was employed as a teacher and did not participate in the retail business on a regular basis. Commencing in 1997 or 1998, Pat frequently but irregularly assisted Terry at the store, but was not paid for her services. In 1998, the store was damaged by a flood. Commencing on June 10, 1999, and from time to time through January 29, 2004, Pat advanced funds to Terry for use in operating the store. On April 8, 2004, Terry suffered a mild stroke, but Pat testified that she did not know this fact. Terry returned to

the store, but the store was closed on May 1, 2004, because of Terry's health and financial concerns.

On July 28, 2005, Pat, Terry, and Irma executed a loan agreement which, with handwritten changes included, provides:

> I, Terry Kidd, promise to pay Patricia Gepner the sum of $34,647.89 plus 5% interest from the date of last disbursement on the amount borrowed from June 10, 1999 through January 29, 2004.
>
> In the event of my death prior to completion of payment of this debt in full, the balance of the debt still outstanding will be assumed by Irma Kidd. The full amount of this debt shall be paid back in full by August 1, 2010.
>
> In the event Patricia Gepner passes before me, Terry Kidd, the debt can't be paid til my death.
>
> The above loan agreement is signed by all agreeing parties and witnesses on July 28, 2005.

This is referred to as the $34,000 Loan Agreement. The typewritten portions of the $34,000 Loan Agreement were prepared by Vicki. When the document was presented to the Kidds for execution, Debtor made various changes by handwritten interlineations, including changing the amount owed from $38,147.89 to $34,647.89. That amount is supported by a worksheet prepared by Pat entitled "Terry Owes Me." It shows advances by Pat to Terry in the amount of $38,147.89 from June 10, 1999, through January 29, 2004, reduced to $34,647.89 by a $3,500 payment on September 6, 2001. The record includes cancelled checks corresponding to several of the advances. Notations on the checks include "Loan," "Store," "Terry loan," and "Terry." The Early Bird balance sheet

4

as of December 31, 2000, includes as a liability $23,332.00 owed to Pat Gepner.

Prior to the execution of the $34,000 Loan Agreement, there was no written note, no understanding of when payment was due, and no agreement for the payment of interest. Pat testified that the $34,000 Loan Agreement included Debtor because Pat thought that Debtor was an owner of the store, but this was not discussed with Debtor. Debtor denies that (1) she owned the business, (2) she discussed the store's finances with Terry, (3) she knew Terry was borrowing money from Pat until the $34,000 Loan Agreement was presented, and (4) she took money out of the store. Debtor testified that she objected to the $34,000 Loan Agreement, but she nevertheless signed it and never did anything to repudiate it.

On November 5, 2005, a revised loan document, the November Loan Agreement, was executed by Terry, Debtor, and Pat. The terms of the November Loan Agreement are identical to the terms of the $34,000 Loan Agreement; the only differences are that the November Loan Agreement, also prepared by Vicki, incorporates the handwritten changes on the $34,000 Loan Agreement as typewritten terms and that it was acknowledged before a notary public. The only payment on the $34,000 Loan Agreement was in the amount of $500 made on November 9, 2005. The payment check sent to Pat was accompanied by a note in Debtor's handwriting stating that the payment was to be applied to the $34,000 Loan Agreement. Pat's claim against Irma's bankruptcy estate is for $49,772.75, the principal and interest alleged to be outstanding on the $34,000 Loan

Agreement as of August 1, 2011, the date Irma filed for bankruptcy relief.[3]  Debtor denies she owes the claim.

On or about July 20, 2000, Pat obtained a loan from Andover State Bank in the sum of approximately $10,000, secured by her home.  She in turn advanced these funds to Terry for use in Early Bird.  Sporadic payments were made from May 7, 2002, through November 12, 2004, and monthly payments of $200 were made from January 2005 through June 2005.  On November 5, 2005, the same date that the $34,000 Loan Agreement was executed, Pat, Terry, and Debtor executed a second loan agreement for $5,484, the balance then due on Pat's loan from Andover State Bank.  This is referred to as the $5,484 Loan Agreement.  In that agreement, Terry promised to pay Pat $200 per month until the balance was paid in full.  The $5,484 Loan Agreement contains the same terms as the $34,000 Loan Agreement regarding Irma's liability in the event of Terry's death.[4]

When Terry passed away on December 8, 2006, approximately $4,000 was owed on the $5,484 Loan Agreement.[5]  When no payments were received in January or March, 2007, Vicki, on behalf of her mother, sent a default letter to Debtor.[6]  The $5,484 Loan

---

[3] Proof of claim no. 1.

[4] Exh. 9.

[5] Exh. 10.

[6] Exh. 12.

6

Agreement was satisfied by a payment of $2,725.21 David made in June 2007.[7]

Debtor received substantial funds as a result of Terry's illness, Terry's death, and the death of Nina Kidd, Terry's mother.  On September 1, 2006, Terry received $26,607.00 in disability benefits.  On February 16, 2007, Debtor received $66,892.15 from Ozark National Life Insurance, and on March 1, 2007, she received $34,918.64 from Prudential Life Insurance Company.  Debtor was the only beneficiary named on the life insurance policies.  Debtor and David testified that these funds were considered "family money."  Terry had made known his wishes that after his death, his family — consisting of Debtor, their daughter Margo, and their son David (and his wife Jennifer) — would be taken care of through a sharing of insurance funds and other receipts.  At the time of Terry's death, all members of the family knew they would share approximately equally in the "family money," notwithstanding the name in which the money was received or later held.  Because Margo had issues concerning her handling of financial affairs, her name was never on any of the accounts holding this "family money," but Debtor and David made withdrawals for her benefit.

The foregoing three items of income were initially deposited into Commerce Bank account *7258, in the names of David or Jennifer Kidd.  On December 20, 2007, Commerce Bank account *0086 was opened.  It is a joint-tenancy payable-on-death account in the names of Irma, David, and Jennifer.  Only Irma's Social Security number

_____

[7] Exh. 10.

is stated on the account card. The unused portion of the "family money" which had been deposited into Commerce Bank account *7258 was transferred to account *0086. Debtor, as the beneficiary of the estate of Nina Kidd, Terry's mother, thereafter received $83,130.29, which was deposited into Commerce Bank account *0086 by Debtor, for convenience and not to indicate ownership. The foregoing receipts total $211,548.08.

Accountings prepared by David trace the use of the "family money" deposited in Commerce Bank accounts *7258 and *0086 for the period from 2006 through 2010.[8] According to the accounting, $70,827.08 of expenditures made on or before December 2, 2009, were attributed to Debtor. They were for funeral expenses, home improvements, debt reduction, and repayment of a loan from her sister. Debtor did not use any of the "family money" after December 2009. Expenditures of $61,644.15 were attributed to David, primarily for home improvements and the purchase of a vehicle. Expenditures of $22,699.68 were attributed to Margo, primarily for debt reduction and medical expenses. This accounting shows the amount of "family money" in Commerce Bank account *0086 in early 2011 was $56,377.17.

On August 26, 2010, Pat commenced an action against Debtor in Sedgwick County District Court to collect the $34,000 Loan Agreement. On January 14, 2011, without seeking Debtor's authorization, David withdrew substantially all of the funds in Commerce Bank account *0086. Approximately $55,000 was transferred to Commerce

---

[8] Exhs. 72 and 73.

Bank account *8371 and $2,992.34 was transferred to Commerce Bank account *8370.

David and Jennifer were the joint owners and the only authorized signers of these two

accounts. Debtor's name was not on either account. David testified that he closed the

*0086 account because he was concerned that if a judgment were entered against his

mother, collection might be attempted from Commerce Bank account *0086. As of

January 14, 2011, $70,827.08 of the previous withdrawals from account *0086 were

attributed to Debtor, so in David's and Debtor's views, Debtor had no interest in any of

the funds in account *0086 when David withdrew them, even though her name was on the

account. David closed the account the following month.

Irma filed for relief under Chapter 7 on August 1, 2011. She was assisted by

counsel, who testified at trial. Irma's Schedule A lists two secured creditors, the holder of

a mortgage on her home and a mechanics lien holder, who has not participated in the

bankruptcy and whose time to foreclose has expired. Pat is the only unsecured creditor

listed on Schedule F. In response to Statement of Financial Affairs (SOFA) question 11,

inquiring about "financial accounts . . . held in the name of the debtor or for the benefit of

the debtor which were closed, sold, or otherwise transferred within **one year** immediately

preceding" the filing of the bankruptcy petition, Debtor listed a savings account at

Commerce Bank and stated, "Removed name from account in January, 2011. None of the

funds in the account belonged to Ms. Kidd."[9] This was a reference to David's closing of

---

[9] Exh. 55.

9

Commerce Bank account *0086. Irma had a long discussion with her counsel about the "family funds" and presented her with a worksheet prepared by David which showed that Debtor's share of the funds was $70,516.03 and that $70,837.01 of the funds had been spent on her behalf. Question 7 of the SOFA, "Gifts," lists only gifts to Irma's church. Based upon her inquiry, counsel understood that David's and Margo's interests in the "family funds" were their inheritances and not gifts from Irma. Question 10 of the SOFA, "Other transfers," and question 14, "Property held for another," are both answered "none." Debtor's counsel testified that based upon her inquiry regarding the "family funds," she believed the answers were accurate.

In August 2011, Debtor had two accounts at Rose Hill State Bank, savings account number *8920 and checking account number *8906.[10] On March 4, 2011, a tax refund of $2,480 was deposited into account *8906, and on March 8, 2011, a telephone transfer in the same amount was made from that account to account *8920. On the date of her bankruptcy filing, Debtor withdrew from the Rose Hill savings account seven cashier's checks totaling $1,060.83 for payments to creditors. Only the payment to her mortgage holder exceeded $600. She also withdrew funds for a $952.29 cashier's check payable to her former trial counsel and for a $929.00 cashier's check payable to her bankruptcy counsel. On Schedule B, item 2, Debtor reported a value of $2,232.54 for checking, savings, or other financial accounts, which is the sum of the balances of the two Rose Hill

---

[10] Additional facts concerning the title to these accounts are included in the Discussion and incorporated into the facts by this reference.

accounts after the foregoing withdrawals. On question 3 of the SOFA, "Payments to creditors," Debtor listed the mortgage holder, who received monthly payments. Line 13 of Debtor's Schedule B lists a "½ interest in Prudential Financial Inc Common Stock" valued at $2,000.

On December 5, 2011, Pat filed her proof of claim, and on December 27, 2011, she filed Adversary No. 11-5291 against Debtor, seeking to have her discharge denied under § 727. On April 16, 2012, the Chapter 7 Trustee, Steven L. Speth, filed a Complaint to Avoid and Recover Fraudulent Transfer against David and Jennifer, seeking to recover the $55,000 withdrawn by David on January 14, 2011, from Commerce Bank account *0086, owned in part by Debtor, and deposited into accounts not owned by Debtor.[11] In March 2014, a notice of intended compromise of the claim for $14,000 was filed.[12] Pat objected to the compromise, and the parties agreed the Court would decide later whether to approve the settlement.

## DISCUSSION.

### A. Debtor's objection to Pat's proof of claim is denied.

Pat timely filed a proof of unsecured claim for $49,772.75, the amount that she claims Debtor owed under the $34,000 Loan Agreement on July 29, 2011, three days before Irma filed for relief under Chapter 7. Debtor objected to the claim "for multiple reasons including but not limited to the fact that [Debtor] does not believe that this debt is

---

[11] Adversary no. 12-5067, doc. 1.

[12] Case no. 11-12357, doc. 75.

11

valid true and owing."[13]  The pretrial order[14] states the following defenses to the claim:

(1) The statute of limitations expired on the verbal agreement to repay the advances

before the oral agreement was reduced to writing on July 28, 2005; (2) no consideration

was given for Debtor's promise to pay; and (3) the payments by Pat were investments, not

loans.  Pat refutes these arguments.

The Court denies Debtor's objection to the claim.  The $34,000 Loan Agreement,

signed by Terry and Debtor, provides, "I, Terry Kidd promise to pay Patricia Gepner the

sum of $34,647.89."  It also provides "[i]n the event of my [Terry's] death prior to the

completion of payment of this debt in full, the balance of the debt still outstanding will be

assumed by Irma Kidd."  Under Kansas law, "[a] guaranty involves a tripartite

relationship based on a contract between two or more persons by which one person

promises to answer for the debt of a third person."[15]  "A contract of guaranty is to be

construed, as are other contracts, according to the intention of the parties as determined

by a reasonable interpretation of the language used in light of the attendant

circumstances."[16]  The $34,000 Loan Agreement unambiguously states that Debtor will

assume her husband's liability to Plaintiff if Terry dies before the debt is paid.  The Court

---

[13] Id., doc. 45.

[14] Adv. no. 11-5291, doc. 81.

[15] *Kansas State Bank & Trust Co. v. DeLorean*, 7 Kan. App.2d 246, 255, 640 P.2d 343, 350 (1982).

[16] *Overland Park Sav. And Loan Ass'n v. Miller*, 243 Kan. 730, 738, 763 P.2d 1092, 1097-98 (1988).

12

therefore finds that Debtor is a guarantor of Terry's obligation.[17]  The balance due when Terry died has not been paid, and Debtor is liable for that debt.

Debtor's testimony was simply that she did not agree she owed the debt on the date of the $34,000 Loan Agreement or when she filed for bankruptcy relief.  She was vague about the factual basis for her position.  Debtor's counsel made several legal arguments, none of which, for the reasons discussed below, provides a defense to payment.

First, the Court rejects Debtor's contention that Pat's claim fails for lack of consideration because the statute of limitations had run on Terry's obligations included in the principal of the $34,000 Loan Agreement before it was executed on July 28, 2005.  Pat testified she believed at all times before July 28, 2005, that she had a right to collect the balance owed on the $34,000 Loan Agreement and that Terry would have honored his obligation.  All of these transactions transpired without the assistance of counsel.

Under Kansas law, forbearing to sue is good consideration for a promise, so long as the one who forbears has a reasonable and sincere belief in the validity of his or her claim.[18]  "'Any forbearance to prosecute or defend a claim or action, or to do an act which one is not legally bound to perform, is usually a sufficient consideration for a

---

[17] Plaintiff argues that Pat is an accommodation party and therefore various provisions of Article 3 of the Uniform Commercial Code are applicable.  The court rejects this argument because the $34,000 Loan Agreement is not a "negotiable instrument" as defined by K.S.A. 2013 Supp. 84-3-104(a).  It is not payable on demand or at a definite time.  Although it states a due date of August 1, 2010, it also provides that "[i]n the event Patricia Gepner passes before me, Terry Kidd, the debt can't be paid til my death."

[18] *Reed v. Hess*, 239 Kan. 46, 51, 716 P.2d 555, 560 (1986).

13

contract based thereon, unless the claim or defense is obviously invalid, worthless or frivolous.'"[19]  The reasonableness and sincerity of the holder's belief in the claim's validity is "'measured, not by the state of the law as it is ultimately discovered to be, but by the state of the knowledge of the person who at the time has to judge and make the concession.'"[20]  Under Kansas law, the statue of limitations to enforce a contact that is not in writing is three years.[21]  Some of the advances which were the subject of the $34,000 Loan Agreement were made more than three years before July 28, 2005, and Terry would have had a valid statute of limitations defense to any action by Pat to collect those advances.  But when Pat asked Terry and Debtor to execute the $34,000 Loan Agreement, she believed the entire debt was enforceable against Terry, and perhaps against Debtor.  Pat is not a lawyer, and there is no evidence that she had any legal advice about the transaction.  Pat's giving up her perceived right to immediately collect the entire claim was sufficient consideration for the $34,000 Loan Agreement.  Under Kansas law, "'an extension of the time of payment of an obligation constitutes in legal effect a forbearance to sue and . . . is a sufficient consideration for a guaranty of the obligation.'"[22]  Therefore Pat's giving up her perceived right to immediately pursue

---

[19] *State, ex rel. Ludwick v. Bryant*, 237 Kan. 47, 52, 697 P.2d 858, 862 (1985) (*quoting Snuffer v. Westbrook*, 134 Kan. 793, Syl ¶ 1, 8 P.2d 950 (1932)).

[20] *Reed v. Hess*, 239 Kan. at 51, 716 P.2d at 560 (*quoting Schiffelbein v. Sisters of Charity*, 190 Kan. 278, 280, 374 P.2d 42 (1962), *which said it was quoting* "12 Am. Jur. p. 581, Sec. 87").

[21] K.S.A. 60-512 (unchanged since 1964).

[22] *Ryco Packaging Corp. v. Chapelle Int'l., Ltd.*, 23 Kan. App. 2d 30, 38, 926 P.2d 669, 675 (1996) (*quoting* 38 Am. Jur. 2d, Guaranty, § 47, p. 1051); *Fuller v. Scott*, 8 Kan. 25, 32, 1871 WL 710 at

14

collection from Terry was also consideration for Debtor's guaranty agreement to assume the outstanding debt upon Terry's death.[23]  Debtor's liability on Pat's claim is not unenforceable for lack of consideration.

The Court also rejects Debtor's position that Pat's claim is unenforceable because the advances to Terry were investments in Early Bird, not loans.  In support of this theory, Debtor relies on the absence of evidence of the terms of repayment before the execution of the $34,000 Loan Agreement.  But this argument ignores the evidence that the checks written by Pat when making the advances bear notations indicating that they are loans and that the Early Bird balance sheet as of December 31, 2000, includes as a liability a loan owed to Pat.

Although the issues stated in the pretrial order do not include whether the principal amount owed by Terry as stated in the $34,000 Loan Agreement was accurate, this issue was raised at trial and was the subject of post-trial briefs, with no objection from Plaintiff.  Debtor argues that Terry's liability for the approximately $10,000 which Pat borrowed from Andover State Bank and then advanced to Terry was included in the balance of the $34,000 Loan Agreement and was also the subject of the $5,484 Loan Agreement.  The record does not support this contention.  The documents evidence that

---

*6 (1871) ("An agreement to extend the time of payment of the note is a sufficient consideration to sustain the guaranty").

[23]  Under K.S.A. 60-520(a), the execution of the $34,000 Loan Agreement started a new limitations period on Pat's collection rights, and because the contract was reduced to writing at that time, the five-year limitations period for written contracts became applicable to it.  Pat brought suit in state court before the new five-year limitations period expired.

Case 11-12357    Doc# 87    Filed 11/25/14    Page 15 of 27

there were separate accountings of the advances represented by the $34,000 Loan Agreement and the $5,484 Loan Agreement. The worksheet prepared by Pat, entitled "Terry Owes Me,"[24] which shows the calculations establishing the balance of the $34,000 Loan Agreement, includes a $20,000 advance on July 26, 2000, the same date as the loan from Andover State Bank. A worksheet prepared by Terry shows two $10,000 advances on the same date.[25] Debtor relies upon this circumstantial evidence, the vague testimony of Pat that the "Terry Owes Me" worksheet contains all of the advances from Pat to Terry,[26] and vague testimony of Vicki that the $10,000 advance is included in the balance of the "Terry Owes Me" worksheet. But Pat was insistent throughout her testimony that there were two separate transactions. The first was multiple advances for which no interest was charged and no repayment schedule was established before the execution of the $34,000 Loan Agreement, and the second was the advancement of the proceeds from the Andover State Bank loan, on which Terry made payments — both before and after the 2005 loan agreements were drafted and executed — to cover principle and interest owed to the bank.

Further, examination of the exhibits refutes Debtor's position. According to Pat's work sheet, the only payment on the $38,147.89 she had advanced was $3,500 paid on

---

[24] Exh. 6.

[25] Exh. 5.

[26] Trial Tr., May 6, 2014, at 71-72.

16

September 6, 2001.[27]  When the $34,000 Loan Agreement was initially signed in July

2005, Debtor corrected the typewritten note by reducing the amount owed, initially

stated to be $38,147.89, by the $3,500.  A separate worksheet regarding the $5,484 Loan

Agreement prepared by Pat's daughter shows Terry's payments to Pat of $4,600 between

May 5, 2002, and June 13, 2005.[28]  If the advance of the proceeds of the Andover Bank

loan were included in the "Terry Owes Me" worksheet, the payments attributed to that

loan should also have been credited on that worksheet.  They were not.  Both the retyped

version of the $34,000 Loan Agreement and the $5,484 Loan Agreement were executed

by Terry and Debtor on November 5, 2005; on that date, the parties agreed that there

were two separate obligations owed to Pat.  The evidence presented persuades the Court

that it is more likely that there were two separate transactions, and the $10,000 advance

from Andover State Bank was not included in the accounting which was the basis for the

$34,000 Loan Agreement.

For the foregoing reasons, the Court overrules Debtor's objections to Pat's proof

of claim.

### B. Denial of Discharge under § 727(a)(2)(A).

A party objecting to a discharge under § 727(a)(2)(A) "'must show by a

---

[27] This payment is also reflected on a worksheet prepared by Terry of the balance owed as of
March 5, 2002.  Exh. 5.  That worksheet also includes three $100 payments in 2001 which are not
reflected on any of Pat's worksheets but appear to correlate with cancelled checks for advances which
bear a notation of "Pd Back."  Exh. 8.

[28] Exh. 10.

preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the [debtor], (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.'"[29]  The discharge provisions of the Code are to be construed liberally in favor of the debtor and strictly against the objector seeking to block the discharge.[30]  Pat, as the plaintiff, has the burden of proof to show each of these elements[31] by a preponderance of the evidence.

Plaintiff's § 727(a)(2)(A) objection to Debtor's discharge is based upon three transfers:  (1) the January 14, 2011 transfer of $2,992.34 from Commerce account *0086, in the names of Irma Kidd, David Kidd, and Jennifer Kidd, to Commerce Account *8370, in the names of David and Jennifer Kidd; (2) the January 14, 2011 transfer of $55,000 from Commerce account *0086 to Commerce account *8371, in the names of David and Jennifer; and (3) the March 8, 2011 transfer of $2,480 from Rose Hill Bank checking account *8906 to Rose Hill savings account *8920.  The Court finds that Pat has failed to prove that these transfers should be the basis for the denial of Debtor's discharge under § 727(a)(2)(A).

The first two of these transfers occurred on the same day under identical

---

[29] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (*quoting Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997)).  The Circuit referred to "property of the estate" in item (2), but § 727(a)(2)(A) actually applies to transfers of property of the *debtor* that were made within one year before filing bankruptcy — no bankruptcy estate exists until the debtor files bankruptcy, so transfers made before that could not involve property of the estate.

[30] 6 *Collier on Bankruptcy*, ¶ 727.01[4] (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2014).

[31] Fed. R. Bankr. P. 4005.

Case 11-12357   Doc# 87   Filed 11/25/14   Page 18 of 27

circumstances, so the Court will consider them together. The parties have stipulated that the transfers were made in January 2011, less than one year before the filing of Debtor's bankruptcy petition, but Debtor contends that Pat has not satisfied her burden of proof on the other three elements.

As to these transfers, the Court agrees Pat has not sustained her burden to prove that the transfers were made by Debtor. The Commerce Bank transactions were made by David, not by Debtor, but Pat argues that David's acts should be attributed to Debtor. Although the acts of an agent may be attributed to the principal for purposes of an objection to discharge,[32] the Court finds a lack of evidence that David was acting as Debtor's agent when he made the transfers. Under Kansas law, "'[w]here the relationship of principal and agent is in issue, the party relying thereon to establish his claim or demand has the burden of establishing its existence by clear and satisfactory evidence.'"[33] There is no direct evidence that David acted as Debtor's agent when making the transfers. Debtor testified that she did not know anything about them. David testified that he made the transfers of his own accord, not at the authorization of his mother. Pat argues that David's acts should nevertheless be attributed to Debtor based upon circumstantial evidence of coordinated conduct between Debtor and her son because Debtor temporarily removed her name from the Rose Hill savings account on

---

[32] *See Gannett v. Carp (In re Carp)*, 340 F.3d 15, 26 & n. 5 (1st Cir. 2003).

[33] *In re Schicke*, 290 B.R. 792, 804 (10th Cir. BAP 2003) (*quoting Turner & Boisseau, Chtd., v. Marshall Adjusting Corp.,* 775 F.Supp. 372, 377-78 (D.Kan. 1991)).

19

the same day that David withdrew the funds from Commerce account *0086. This circumstantial evidence of actions by both Debtor and David regarding the title to bank accounts does not prove agency by "clear and satisfactory evidence."

Further, the Court finds that even if David was acting as Debtor's agent, Pat still could not prevail because she failed to prove that Debtor, through David, acted with the intent to hinder, delay, or defraud Pat. David and Debtor consistently and convincingly testified that Debtor had withdrawn her one-third share of the "family money" from Commerce account *0086 by approximately December 2009, and that in their view, on January 14, 2011, Debtor had no interest in the funds on deposit in Commerce account *0086. Details of the withdrawals were provided by David. They allocate $70,827.08 to Debtor. This is approximately one-third of the $221,548.08 "family money."[34] All of these withdrawals for the benefit of Debtor were made on or before December 2, 2009, although withdrawals for David's and Margo's benefit continued thereafter. David testified that he made the January 2011 transfers because he was concerned that funds remaining in Commerce account *0086 after December 2009, which he believed belonged to him and Margo and not their mother, could be garnished if Pat prevailed in her litigation against Debtor. David's intent was to protect his and his sister's property, not to hinder or delay Pat's claim to Debtor's property. Because David sincerely believed as of January 14, 2011, that Debtor had no interest in the funds in Commerce

---

[34] *E.g.*, exh. 73.

20

account *0086 when he transferred that money, he could not have acted with the intent to hinder, delay, or defraud Pat from getting Debtor's property.

The Court therefore denies Pat's objection to Debtor's discharge under § 727(a)(2)(A) based upon the January 2011, transfers of the balance of Commerce account *0086, in the names of Debtor, David, and Jennifer, to accounts which did not include Debtor as an owner. Pat has failed to prove two necessary elements (that the transfers from Commerce Bank account *0086 were made by Debtor and that they were made with the intent to hinder, delay, or defraud Pat).[35]

The Court also finds that Pat has failed to sustain her burden to prove that Debtor's discharge should be denied under § 727(a)(2)(A) based upon the transfer of $2,480 from Rose Hill checking account *8906 to Rose Hill savings account *8920 on March 8, 2011. In support, Pat cites an exhibit prepared by Pat's daughter which states that on March 8, 2011, less one year prior to filing her bankruptcy petition, "Irma transferred U.S. Income Tax Refund from Rose Hill checking account to David Kidd savings account." Although a transfer between two Rose Hill accounts was made on that date, there was no resulting change of ownership. The account statements show the

---

[35] The Court makes no ruling on whether Debtor had an interest in the balance in Commerce Bank account *0086 in January 2011 before the transfers were made. Debtor argues that a gift of one-third of the "family money" was given to David and one-third to Margo when the funds were received by Debtor, that approximately one-third of the balance had been withdrawn by Debtor before January 2011, and that Debtor therefore had no interest in the account balance in January 2011. Pat, on the other hand, argues that although the account was a co-tenancy account, the funds were all owned by Debtor. She contends no gift tax return was ever filed, Debtor had full access to the balance in the account, the accounting showing Debtor's share of the "family money" is not accurate, and only Debtor's Social Security number was associated with the account.

21

deposit of the $2,480 tax refund to account *8906 on March 4, 2011, and a telephone

transfer of the same amount to account *8920 on March 8, 2011, but both account

statements identify David, Jennifer, and Debtor as co-owners of the accounts.  The

signature card for the *8920 account dated July 6, 2007, identifies all three of them as

owners, but includes only Debtor's Social Security number.  On January 14, 2011,

Debtor's name was removed from account *8920, but an updated signature card for that

account dated January 15, 2011, one day later, again shows all three family members as

owners, but bears David's Social Security number.  The only change resulting from the

removal of Debtor's name on the account for one day was the change of the Social

Security number associated with the account from Debtor's to David's.  Debtor does not

dispute that she continued to have an ownership interest in both Rose Hill accounts, and

on Schedule B, she included the balances of both Rose Hill accounts as of the date of her

bankruptcy filing.  The evidence therefore shows that the March 8, 2011 transfer was

between two accounts that were both titled jointly in the names of Debtor, David, and

Jennifer.  There was no transfer of Debtor's property for purposes of the denial of

discharge under § 727(a)(2)(A).

> **C. Denial of Discharge under § 727(a)(4)(A).**

Section 727(a)(4)(A) provides that a discharge shall be denied if "the debtor

knowingly and fraudulently, in or in connection with the case — (A) made a false oath

or account."  The denial of a discharge under § 727(a)(4)(A), like the denial of a

discharge under § 727(a)(2)(A), requires proof that the debtor acted with a wrongful

22

intent.  The knowing and fraudulent omission of items from the debtor's bankruptcy schedules is a common instance of a false oath.  However, omissions based "upon honest advice of counsel, to whom the debtor had disclosed all the relevant facts, . . . will not be deemed willfully false."[36]

Pat contends that Debtor knowingly and fraudulently made false statements in her Statement of Financial Affairs because:  (1) she failed to identify the sale of the Prudential stock and the deposit of the proceeds in David's account; (2) she failed to disclose the removal of her signature from the Rose Hill savings account; and (3) she failed to disclose the January 2011 transfer of funds from Commerce Bank account *0086.[37]

Debtor's Schedule B, "Personal Property," lists on line 13 a "½ interest in Prudential Financial Inc Common Stock" valued at $2,000.  The stock was owned in the name of "Irma E. Kidd TOD David E. Kidd."  Debtor inherited her interest through Terry.  The stock was sold on July 29, 2011, the proceeds of $4,362.68 were received on August 8, 2011  (after Debtor filed her bankruptcy petition), and the proceeds were deposited into Commerce account *8371, owned by David and Jennifer, on August 11, 2011.  On the advice of Debtor's bankruptcy counsel, Debtor paid the Trustee $2,181.34, one-half of the proceeds, by a cashier's check dated September 8, 2011.  On the advice of Debtor's litigation counsel, David paid the Trustee $2,181.34 by a cashier's check

---

[36] 6 *Collier on Bankruptcy*, ¶ 727.04[2].

[37] Doc. 81.

dated December 5, 2011.

Dana Milby, Debtor's bankruptcy counsel, testified that the entry on Schedule B of a one-half interest in the stock was based upon Debtor's understanding that she owned a one-half interest and David owned the other one-half interest. When distributing the proceeds, Debtor acted consistent with this understanding. There is no evidence that Debtor, when making this representation, was acting with wrongful intent. If Debtor's intent was to conceal her interest in the stock, she would have made no disclosure, rather than an incomplete disclosure. The reporting that the stock was presently owned, rather than in the process of being sold, is not material. A discharge will not be denied based upon the incomplete disclosure of Debtor's ownership of the Prudential stock.

The second omission relied upon by Pat is the failure to disclose the removal of Debtor's name from Rose Hill savings account *8920. Debtor's Statement of Financial Affairs, question 11, "Closed financial accounts," states that Debtor's name was removed from a Commerce Bank savings account in January 2011. There is no mention of Rose Hill accounts. The exhibits show that the signature card for Rose Hill savings account *8920 dated July 6, 2007, identifies Debtor, David, and Jennifer as joint owners, but includes only Debtor's Social Security number. On January 14, 2011, Debtor's name was removed from account *8920, but an updated signature card for that account dated January 15, 2011, one day later, again shows all three family members as owners, but bears David's Social Security number. The only change resulting from the removal of Debtor's name on the account for one day was the change of the Social Security number

24

associated with the account from Debtor's to David's. Debtor continued to have an

ownership interest in the account. Debtor included the balance in the Rose Hill savings

account and the Rose Hill checking account on the date of her bankruptcy filing in item

2 on Schedule B.[38] Although Debtor's Statement of Financial Affairs would have been

more complete if she had disclosed the changes to the Rose Hill savings account, the

Court finds that the omission was not material and cannot be the basis for the denial of

her discharge.

The third omission relied upon by Pat is Debtor's failure to disclose the $58,000[39]

that was transferred from Commerce account *0086, in the names of Debtor, David, and

Jennifer, to David's and Jennifer's accounts in January 2011. Debtor's bankruptcy

attorney testified that she had a long discussion with Debtor about her understanding that

she had no interest in the funds in the Commerce account when the transfer was made.

Counsel reviewed a worksheet prepared by David showing that Debtor's share of the

$211,548.08 in "family funds" was $70,516.03, and that as of January 2011, Debtor had

withdrawn $70,837.01 of the funds. Based upon this inquiry, counsel understood that

David's and Margo's interests in the family funds removed from Commerce account

*0086 on January 14, 2011, were their inheritances, in which Debtor had no interest.

---

[38] Trial Tr. 149, ll. 8-23.

[39] This is the sum of two transfers, one of approximately $3,000 from Commerce Account *0086 to Commerce Account *8370 and the other of $55,000 from Commerce Account *0086 to Commerce Account *8371. They are the basis for Plaintiff's first and second objections to discharge under § 727(a)(2)(A), discussed above. The $55,000 transfer is also the subject of the adversary proceeding brought by the Trustee against David and Jennifer, which has been settled.

25

Counsel therefore prepared the response to question 11, "Closed financial accounts," stating that a savings account at Commerce Bank had been closed by removal of Debtor's name from the account in January 2011, and that "[n]one of the funds in the account belonged to Ms. Kidd." Question 10 of the SOFA, "Other transfers," and question 14, "Property held for another person," were both answered "none." Debtor's counsel testified that based upon her inquiry about the "family funds," she believed the answers were accurate.

Assuming, but not deciding, that the entire balance in Commerce account *0086 in January 2011 was Debtor's property, the Court nevertheless finds the inaccuracies and omissions cannot be the basis for the denial of Debtor's discharge. Debtor's belief that the funds were "family money" and that she had withdrawn her entire share prior to January 2011 were thoroughly discussed with her counsel. Based upon the testimony as a whole, the Court has no doubt that Debtor and David sincerely believed that Debtor had no interest in the remaining "family funds" in January 2011. There is therefore no basis to find that the errors and omissions regarding the withdrawals from and closure of Commerce account *0086 were knowing and fraudulent.

**CONCLUSION.**

For the foregoing reasons, the Court denies Debtor's objection to Pat's proof of claim, and denies Pat's objection to discharge under § 727(a)(2) and § 727(a)(4)(A).

26

Judgments based on these rulings will be entered on separate documents.

**IT IS SO ORDERED.**

# # #